UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: EX PARTE APPLICATION OF GLOBAL ENERGY HORIZONS CORPORATION | Case No. 17-mc-80009-JSC<br><br>**ORDER GRANTING REQUEST FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN A FOREIGN LEGAL PROCEEDING PURSUANT TO 28 U.S.C. 1782**<br><br>Re: Dkt. No. 1 |

Applicant Global Energy Horizons Corporation ("GEHC") filed an *ex parte* application to take discovery pursuant to 28 U.S.C. § 1782. (Dkt. No. 1.[1]) That statute allows a district court to order a person residing or found within its district to produce documents or provide testimony for use in a foreign legal proceeding, unless the disclosure would violate a legal privilege. Here, GEHC seeks an order granting it leave to serve a subpoena on MUFG Union Bank, N.A. ("Union Bank") seeking documents in connection with a breach of fiduciary duty lawsuit pending in the English High Court of Justice, Chancery Division. Upon consideration of GEHC's application and the relevant legal authority, the Court GRANTS the application.

## BACKGROUND

**I.    Procedural History of the English Action**

GEHC is the plaintiff in a breach of fiduciary duties action pending in the English High Court of Justice, Chancery Division (the "English Court"). In the case, *Global Energy Horizons Corp. v. Robert Gresham Gray*, Case No. HC10C04266 (the "English Action"), GEHC contends that defendant Robert Gresham Gray breached fiduciary duties that he owed to GEHC

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

> related to the "Acquisition Strategy" that concerned ultrasound technology or Acoustic Well Stimulation ("AWS" or "ultrasound") technology, which was intended to increase production from inaccessible oil and gas reserves particularly in mature and underperforming wells. The concept behind the Acquisition Strategy was to acquire such underperforming oil wells and utilise [sic] the AWS technology in them so as vastly to increase their remaining production.

(Dkt. No. 4-2 at 6.) After bifurcating the case into liability and damages phases, the English Court entered judgment against Gray at the liability stage, finding that he breached fiduciary duties he owed to GEHC in connection with the Acquisition Strategy when he (1) began to work for a fund that was also an investor in the strategy; (2) took an ownership interest in RegEnersys, an entity the fund had created to carry out the Acquisition Strategy; and (3) obtained an interest in RegEnersys profits from its eventual acquisition of the Ultrasound Technology. (*Id.* at 116-122.) In the judgment, the English Court concluded that GEHC is entitled to "all monies and benefits received by [Gray] directly or indirectly arising out of" his breaches. (*Id.* at 124; *see also* Dkt. No 4-3.) The English Court further concluded that GEHC is entitled to an "[a]n enquiry as to the arrangements to which [Gray] is a party directly or indirectly providing for" all monies and benefits that he received as a result of his breaches. (*Id.*; *see also* Dkt. No. 4-3.) The English Court's judgment is final. (*See* Dkt. No. 4-5 (Her Majesty's Court of Appeal refusing Gray's permission to appeal).)

The English Court set a hearing on damages—a "Valuation Hearing"—and ordered that the "parties . . . have liberty . . . to approach third parties to obtain for the purpose of the Valuation Hearing trading, financial and other relevant information" regarding certain entities and their "joint venture partners." (Dkt. No. 4-4 ¶ 2.) It further ordered that the parties are at liberty to approach "other third parties (including by way of letters rogatory granted by this Court and/or disclosure applications in this jurisdiction and abroad) to obtain information for the purposes of the Valuation Hearing including (but not limited to) whether [Gray] is now implementing the Acquisition Strategy, and whether he must account to GEHC for any profits held by him as a result thereof." (*Id.* ¶ 3.)

## II. GEHC's Factual Basis for Discovery from Union Bank

In an earlier Section 1782 application, GEHC obtained discovery from El Paso Exploration and Production Company ("El Paso") and its affiliates based on a showing that Gray worked with El Paso to exploit the ultrasound technology and/or implement a strategy similar to the Acquisition Strategy. *See In re Ex Parte Application of Global Energy Horizons Corp.*, No. 13-mc-256 GMS, Dkt. No. 3 (D. Del. Oct. 1, 2013) (order granting application); *In re Ex Parte Application of Global Energy Horizons Corp.*, No. 13-mc-256 GMS, Dkt. No. 1 at 3 (D. Del. Sept. 6, 2013) (application). Presumably, GEHC's showing here is based on documents it has obtained from El Paso.

In 2005, GEHC entered an agreement to allow El Paso to test its wells using the Ultrasound Technology. (Dkt. No. 4-7.) Gray connected GEHC to El Paso, through its then-President, his close friend Lisa Stewart. Gray's breach arose when he continued to act on GEHC's behalf in connection with its plans to implement the Acquisition Strategy by obtaining a license to the Ultrasound Technology for GEHC while also acting on behalf of and owning an interest in RegEnersys, which sought to acquire the Ultrasound Technology itself. (*See* Dkt. No. 4-2 ¶¶ 142, 144, 146.) GEHC contends that Gray, El Paso, and several other entities—including Smith Production and Sheridan Productions—were operating a joint venture through which they unlawfully implemented the Acquisition Strategy utilizing the Ultrasound Technology without GEHC. (Dkt. No. 1 at 4.) GEHC now seeks discovery into documents in the possession of Union Bank relating to financing for certain transactions those entities entered into, purportedly in furtherance of their joint venture.

GEHC believes that Gray had begun testing El Paso's wells using the Ultrasound Technology in 2006 unbeknownst to GEHC. (*See* Dkt. No. 1 at 10.) Union Bank financed Smith Production's purchase of gas wells in Texas through credit line increases that coincided with El Paso's assignment of interest in certain gas wells to Smith Production in 2006 and 2008. (*See* Dkt. No. 1 at 9 (citing Dkt. No. 4-9, 4-10).) Under the terms of the mortgage agreements, Union Bank took possession of the wells and all of the equipment used at the wells. (Dkt. Nos. 4-9, 4-10.) Because the underwriting documents list the equipment used at each well, they should reveal

1  whether El Paso was using the Ultrasound Technology to test the wells sold to Smith Production.
2  Thus, Union Bank's loan underwriting documents may lead to discovery of information showing
3  that Gray, El Paso, and Smith Production were using the Ultrasound Technology at the well assets
4  Union Bank underwrote in breach of Gray's fiduciary duty to GEHC.

GEHC offers other facts to support its contention that the Union Bank documents may reveal that the joint venture was using the Ultrasound Technology at the well assets that Union Bank underwrote: (1) El Paso lawfully used the Ultrasound Technology on a number of gas assets that resulted in increased gas production, so El Paso knew how effective the technology was (*see* Dkt. Nos. 4-11, 4-12); (2) El Paso assigned an interest in other gas assets to Smith Production in which El Paso and Smith Production each held a 50% interest in the assets—a sharing arrangement indicative of a joint venture (Dkt. No. 4-15); and (3) the assignments were backdated to pre-date the use of the Ultrasound Technology on the fields—purportedly a strategic move to make the assets appear less valuable (Dkt. No. 4-16; Dkt. No. 4-13 ¶¶ 3-7). Further, in October 2006, after Stewart left El Paso, Gray obtained a personal ownership interest in the Ultrasound Technology with the execution of a draft term sheet that gave RegEnersys—of which Gray owned a 10% interest—equity in the company that owned the Ultrasound Technology. (Dkt. No. 4-8.) Around the same time, two El Paso wells went from being operated by El Paso to being operated by Smith Production. (*See* Dkt. No. 4-17 at 3; Dkt. No. 4-18 at 6.) Production at these wells increased, which suggests that Smith Production used the Ultrasound Technology. (*See* Dkt. No. 4-11 at 3; Dkt. No. 4-20 at 7; Dkt. No. ¶ 8.) Smith Production also drilled five new wells the following month (Dkt. No. 4-17), and GEHC maintains this was because the joint venture believed the wells would be valuable with the help of the Ultrasound Technology. (*See* Dkt. No. 1 at 17.)

Finally, in addition to the well data showing increased well production, one of the Ultrasound Technology tools went missing during the same time the joint venture was believed to be testing Texas wells, and according to GEHC's oil and gas consultant, the particular missing tool is ideally used for the type of gas formation in those wells. (*See id.* at 18-19; Dkt. No. 4-22; Dkt. No. 4-23; Dkt. No. 4-12 ¶ 9.) In short, GEHC believes that the successful Texas testing demonstrated the commercial viability of certain oil and gas fields, which incited the El Paso-

4

Smith Production sale that Union Bank financed, and that the new drilling in 2006 was the venture's "implementation of a commercial strategy consistent with the Acquisition Strategy." (Dkt. No. 1 at 19.) GEHC also contends that a third entity, Sheridan Production Company, also joined the joint venture. (*See* Dkt. No. 1 at 21.) Stewart started Sheridan Production Company after she left El Paso. In 2008 El Paso sold gas fields to Smith Production, which in turn sold the assets to Sheridan. (Dkt. Nos. 4-26, 4-27, 4-28.)

GEHC filed the instant application on January 9, 2017, seeking documents in the possession of Union Bank relating to the underwriting of the 2006 and 2008 mortgages, documents concerning any interest Union Bank has in the Ultrasound Technology, and communications between Union Bank and the members of the alleged joint venture regarding the mortgages or the Ultrasound Technology between 2005 and 2013. (*See* Dkt. No. 4-1 at 7.) According to GEHC, these documents likely will (1) confirm that the joint venture performed tests on Texas fields from January to March 2006; (2) confirm that the joint venture implemented a commercial testing program that year; (3) identify Gray and other associated entities that may have guaranteed the line of credit extended to Smith Production; and (4) identify Gray and other associated entities who may have benefitted financially from using the Ultrasound Technology on the transferred gas assets. Put simply, Union Bank's underwriting documents may show that the joint venture's successful use of the Ultrasound Technology influenced Union Bank's decision to finance the asset purchase; GEHC argues that, if such is the case, it is an example of Gray and the joint venture employing the Acquisition Strategy and thus, the joint venture's profits should be part of Gray's damages in the English Action.

## ANALYSIS

### I.   Statutory Authority

Section 1782(a) provides, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may

5

> direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782(a). GEHC's application satisfies these minimum statutory requirements. First, Union Bank resides in San Francisco, California, which is in this District. (*See* Dkt. No. 4-1.) Second, the requested discovery is for use in an English lawsuit, which is a proceeding before a foreign tribunal. Third, an "interested person" seeking to invoke the discovery mechanisms of Section 1782 may include "litigants before foreign or international tribunals . . . as well as any other person . . . [who] merely possesses a reasonably interest in obtaining [judicial] assistance." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256-57 (2004) (quotation marks and citation omitted). GEHC is a party to the proceedings underlying this case; indeed, it is the plaintiff that has successfully challenged Gray's breach of fiduciary duty and now seeks to determine the damages that have flowed from his conduct. (*See* Dkt. No. 4-2 at 6.) Accordingly, GEHC has a "reasonable interest" in obtaining judicial assistance and, therefore, may apply for judicial assistance pursuant to Section 1782. *See Akebia Therapeutics, Inc. v. Fibrogren, Inc.*, 793 F.3d 1108, 1110 (9th Cir. 2015).

## II.     Discretion

Even once the applicant has met the statutory prerequisites, the court retains wide discretion to grant discovery under Section 1782. *See Intel*, 542 U.S. at 260-61. In exercising its discretion, the court considers the following factors: (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court judicial assistance"; (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome." *Id.* at 264-65.

"A district court's discretion is to be exercised in view of the twin aims of [Section] 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *In re Request for Int'l Judicial Assistance from the Nat'l Ct. Admin. of the Republic of Korea*, No. C15-80069 MISC LB, 2015

WL 1064790, at *2 (N.D. Cal. Mar. 11, 2015) (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004)). The party seeking discovery need not establish that the information sought would be discoverable under the foreign court's law or that the U.S. would permit the discovery in an analogous domestic proceeding. *See Intel*, 542 U.S. at 247, 261-63.

Here, the Court finds good cause to exercise its discretion to authorize the requested discovery. Union Bank is not a party to the English Action and it is not within the jurisdiction of the English Court, thus, its documents are unattainable absent Section 1782(a) aid. The English Court's judgment and order finding Gray liable for breach of fiduciary duty and setting a Valuation Hearing demonstrates that the English Court is receptive to the assistance of United States District Courts, as it specifically directed the parties to approach third parties "including by way of . . . disclosure applications . . . abroad[.]" (Dkt. No. 4-4 ¶ 3.) Each of these factors supports a finding of good cause to grant the requested discovery.

As for whether the request is unduly burdensome or intrusive, the proposed subpoena is limited to information Union Bank has relating to two specific transactions—the 2006 and 2008 mortgages financing Smith Production's purchase of gas wells from El Paso—and communications with individuals believed to be involved in the joint venture about those transactions or the Ultrasound Technology. The subpoena does not seek to inquire broadly into Union Bank's business matters. On the other hand, Union Bank has not had an opportunity to respond to the application or to raise any arguments about the burden or intrusion the subpoena imposes on him. But the Ninth Circuit has held that Section 1782 applications for subpoenas may be filed ex parte because the respondent can "raise[ ] objections and exercise[ ] their due process rights by motions to quash the subpoenas." *In re Letters Rogatory from Tokyo Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976). Union Bank shall therefore have 30 calendar days after service of the subpoena to contest it, provided it first meets and confers in good faith with Petitioner.

## CONCLUSION

For the reasons described above, the Court GRANTS GEHC's application and authorizes service of a subpoena in substantially the form attached as Exhibit 1 to the application. (Dkt. No. 4-1.) The return date of the subpoena shall be set after the expiration of the 30-day period to allow

Union Bank to contest the subpoena if it has a good faith basis for doing so. Should Union Bank file a motion to quash, this action shall automatically be reopened.

This Order disposes of Docket No. 1. The Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: February 10, 2017

*Jacqueline Scott Corley*
_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California